## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JIMMY N. CASTLE,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08-cv-00018 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By:  GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Jimmy N. Castle, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Castle's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008).  Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).  (West 2003 & Supp. 2008).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Castle filed his applications for DIB and SSI on December 16, 2003, alleging disability as of August 1, 2001, (Record, ("R") at 24, 424-28, 889-92), due to carpal tunnel in both wrists, severe joint pain, back pain with pain radiating down both legs, headaches and right wrist pain with decreased grip in the right hand. (R. at 465.) The claims were denied initially, (R. at 363), and on reconsideration. (R. at 364.) Castle then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on August 30, 2005, at which Castle was represented by counsel. (R. at 948-74.)

By decision dated December 13, 2005, the ALJ denied Castle's claims. (R. at 23-33.) The ALJ found that the doctrine of res judicata applied to the period on and prior to September 16, 2003. (R. at 31.) He found that no new and material evidence had been presented which would affect the finality of the prior decision of September 16, 2003, and there was no basis for reopening the prior decision.[1] (R. at 31.) Castle met the insured status requirements of the Act for DIB purposes through September 30, 2004. (R. at 32.) The ALJ also found that Castle had not engaged in substantial

---

[1] The court notes that Castle filed previous applications for SSI and DIB in June 2002, alleging disability commencing August 1, 2001. (R. at 63-66.) These applications were denied by an ALJ on September 16, 2003, (R. at 46-47), and the decision was not appealed. (R. at 24.)

gainful activity since September 30, 2004, the amended onset date. (R. at 32.) The ALJ found that Castle suffered from a severe impairment, namely degenerative disc disease of the cervical and lumbar spine. (R. at 32.) The ALJ found, however, that Castle did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32.) The ALJ found that Castle retained the residual functional capacity, ("RFC"), to perform work which involves lifting and carrying 25 pounds occasionally and 10 pounds frequently. (R. at 32.) He also found that Castle could occasionally climb, stoop, kneel, crouch and crawl, but could not perform overhead reaching. (R. at 32.) Thus, the ALJ found that Castle could not perform his past relevant work as a bulldozer operator, framer hanger, garage door installer, service technician and timber cutter. (R. at 32.) The ALJ opined that Castle had the RFC to perform a significant range of light work.[2] (R. at 32.) Based on Castle's age, education, work history, RFC and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Castle could perform, including those as a security guard, night watchman, assembler, inspector, machine tender, hand packer and waiter. (R. at 33.) Therefore, the ALJ concluded that Castle was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Castle pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 13-15). Castle then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can

3

Commissioner's final decision.  *See* 20 C.F.R. §§ 404.981, 416.148 (2008).  This case is before this court on Castle's motion for summary judgment, which was filed on December 31, 2008, and on the Commissioner's motion for summary judgment, which was filed on February 2, 2009.

## *II. Facts*

Castle was born in 1960, (R. at 55, 294), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008).  Castle has a high school education and past relevant work experience as a bulldozer operator, framer hanger, garage door installer, service technician and timber cutter.  (R. at 32, 466-67.)

Castle testified that he injured his neck while operating a bulldozer.  (R. at 953.) He explained that he was "building a location" for a gas company in order to commence drilling and he was in the process of moving a large rock with his bulldozer when the injury happened.  (R. at 953.)  He stated that he was operating a bulldozer that was too small for the job of moving such a large rock.  (R. at 953.)  As a result, he explained that he had to move the rock one side at a time, and this "would actually jack [the] dozer up [in the air]."  (R. at 954.)  Castle noted that at one point, the bulldozer was up in the air and the rock broke off causing the bulldozer to "flip [him] back in the seat, and when it did, it compressed [his] neck and [his] back."  (R. at 954.)

_____

perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

Castle explained that he subsequently had surgery on his neck, causing him to miss time from work. (R. at 954.) Following the surgery, Castle testified that he had some steroid injections in his neck, but stated that such injections "actually hurt [him] more than it helped [him]," as it actually "made [his] headaches worse." (R. at 954.) Regarding the range of motion in his neck, Castle explained that he "can't really turn [his] neck" and he "can't look behind [him] or to the side." (R. at 955.) He stated that instead of just "turning [his] head, [he'll] just turn [his] body [in order] to look." (R. at 955.)

Castle stated that he was taking pain medications such as OxyContin, Percocet and Xanax. (R. at 955.) Castle noted that he was prescribed the Duragesic patch, but that he discontinued its use because it did not provide him any relief. (R. at 955.) Castle stated that Dr. James Senter, M.D., prescribes his pain medication and monitors his dosage level. (R. at 956.) Castle additionally stated that he is also treated by Dr. Maurice Nida, M.D., his original family physician. (R. at 956.) Castle explained that once he stopped working, he became insured through his wife's insurance plan, and she worked for the hospital where Dr. Nida became his doctor. (R. at 956.) Castle noted that Dr. Nida had treated him for depression, as well as pain, and referred Castle to a pain management specialist. (R. at 956-57.)

With regard to his neck pain, Castle testified that it caused frequent headaches, some of which could be controlled by "positioning [his] head in certain places." (R. at 957.) He stated that in certain positions, the nerve pain will "run [down] his shoulder" and go into his arm down to his elbow. (R. at 957.) He explained that his pain caused problems with the use of his hands to the point that it was difficult to hold and grip

5

things.  (R. at 957.)  Regarding his hands, Castle testified that he had been diagnosed with carpal tunnel, which required surgery on both hands.  (R. at 957.)  Despite the surgery, he stated that he still experienced pain and numbness in his hands, as well as trouble gripping things.  (R. at 958.)  Castle described his problem as feeling as though he "can't control [his] hand completely."  (R. at 958.)

Castle also testified regarding problems with his knees.  (R. at 958.)  Castle explained that, although he had surgery on his left knee, the surgery did not provide any relief.  (R. at 958.)  He additionally explained that he was still awaiting surgery on his right knee, which he opined was "giving [him] more trouble."  (R. at 958.)  Castle stated that the doctor told him that he needed total knee replacement.  (R. at 958.)

Castle testified that he has had several magnetic resonance imagings, ("MRI"), had been performed on his back, which found that he had four to five degenerative discs.  (R. at 959.)  Castle stated that he had a pinched nerve in his back, and the doctors told him his only option at the time was "to fuse all [his] discs together in [his] back."  (R. at 959.)  Castle explained that he was diagnosed with fibromyalgia due to the joint pain he had been experiencing.  (R. at 959.)

Castle stated that Dr. Lanthorn was treating him for depression and anxiety, and had diagnosed him with "pain disorder."  (R. at 959.)  Castle explained that his depression and anxiety has caused many problems at home with his family.  (R. at 959-60.)  Castle noted that he was "irritable all the time" and that he had trouble "with just being around people."  (R. at 960.)  Castle stated that he "just [does not] feel like [he is] the same person he was before [he] had all the problems [he has] had."  (R. at

6

960.)  Castle noted that he rarely socialized outside the family, explaining that he did not "want to be around nobody."  (R. at 960.)

Castle additionally noted that he had experienced trouble with his memory since the accident, stating that he could not remember most of his appointments.  (R. at 960.)  He stated that unless his wife writes down his appointments, he will forget them.  (R. at 960.)  Castle testified that he had trouble sleeping, indicating that he was normally "up and down all night," getting maybe two or three hours of sleep at a time.  (R. at 961.)  Castle explained that he was prescribed Lunesta, which "help[ed] some," but noted that he continued to awake during the night because he was "usually uncomfortable."  (R. at 961.)

Castle testified that, each morning, he held his 15-year old son get ready for school, noting that he usually napped and watched television the remainder of the day.  (R. at 961.)  He explained that he did not do anything "that might agitate [] any of [his] problems."  (R. at 962.)  Castle noted that his doctors recommended that he go outside to help his depression, and as a result, Castle stated that sometimes he "might walk outside" and "get a little bit of sunshine."  (R. at 962.)

With regard to his walking ability, Castle noted that he could only be on his feet for about 30 to 45 minutes at a time before experiencing pain.  (R. at 962.)  In addition, Castle noted that he could not sit for extended times, as the nerve in his back would pinch, causing a sensation to run down his leg into his knees.  (R. at 962-63.)  He testified that, if he sat too long, it caused his knees lock up, forcing him to stand.

7

(R. at 963.)  He stated that he was "constantly switching back and forth from the sitting and standing positions."  (R. at 963.)

Castle explained that during the day, he primarily slept, stating that he did not participate in any housework other than occasionally loading the dishwasher.  (R. at 963.)  He stated that he did not grocery shop or perform yard work, explaining that his wife and son completed those chores.  (R. at 964.)  Castle noted that he only drove "when [he] has to," such as when his wife was unable to drive him to the doctor.  (R. at 965.)  He explained that he experienced pain after being in a car for extended periods.  (R. at 965.)

Norman Hankins, a vocational expert, also was present and testified at Castle's hearing.  (R. at 966-72.)  Hankins classified Castle's past relevant work as a bulldozer operator and garage door installer as heavy[3] and skilled work; his work as a construction framer and carpenter as medium[4] and skilled; his work as a brush cutter as heavy and unskilled work; and his work as a service technician as medium and skilled.  (R. at 968.)  Hankins was asked to consider a hypothetical individual of Castle's age, education and work history, who would be limited to the findings by Dr.

_____

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can perform heavy work, he can also perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can perform medium work, he also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

8

William Humphries, M.D., set forth in Exhibit C19F.[5]  (R. at 969.)  Hankins testified that such an individual could perform light work with only occasional climbing, stooping, kneeling, crouching and crawling.  (R. at 969.)  Hankins further stated that such an individual could work as a security guard, night watchman, assembler, hand packer, inspector, machine tender or waiter in a restaurant.  (R. at 969.)  Hankins testified that there are at least 60,000 such jobs in Virginia and 4 million jobs nationally.  (R. at 969.)

Hankins was next asked to consider the same individual, but to assume that such individual would be limited to the findings by Dr. James P. Senter, M.D., set forth in Exhibit C20F.[6]  (R. at 970.)  Hankins stated that such an individual could perform sedentary[7] work in terms of lifting, but would have to sit and stand some in combination, and he could only work seven hours in a day.  (R. at 970.)  As such, Hankins concluded that there would be no jobs that such an individual could perform.  (R. at 970.)

Hankins was next asked to consider all of the facts present in the first hypothetical, but to assume that the individual had the non-exertional limitations as set forth in Exhibit C18F.[8]  (R. at 971.)  Hankins stated that these findings would not have

---

[5] Exhibit C19F refers to Dr. Humphries' independent medical exam report.  (R. at 797-801.)

[6] Exhibit C20F refers to Dr. Senter's Medical Assessment Of Ability To Do Work-Related Activities (Physical).  (R. at 970, 805-807.)

[7] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).
[8] Exhibit C18F refers to a psychology report by Donald G. Hiers, Ph.D.  (R. at 793.)

9

any effect on the jobs Castle could perform. (R. at 971.) Hankins was next asked to consider all the facts present in the first hypothetical, but to assume that such an individual had the non-exertional limitations as set forth in Exhibit C17F.[9] (R. at 971.) Hankins opined that these limitations would eliminate all of the jobs that Castle could perform. (R. at 971.)

Hankins was next asked to consider a hypothetical individual with the same age, education and past relevant work experience as in the previous hypotheticals. (R. at 972.) However, the ALJ asked Hankins to apply Castle's testimony to the hypothetical and assume it was credible and reliable. (R. at 972.) Hankins opined that Castle's testimony would place him at less than sedentary work, and that there were no jobs in existence that he could perform based on his testimony. (R. at 972.)

In rendering his decision, the ALJ reviewed records from Dr. Maurice Nida, M.D.; Community Physicians Services; Dr. James Senter, M.D.; B. Wayne Lanthorn, Ph.D.; Dr. Marco Berard, M.D.; Norton Community Hospital; Appalachian Orthopaedic Associates; Dr. Richard M. Surrusco, M.D., a state agency physician; Eugene Hamilton, Ph.D., a state agency psychologist; R.J. Milan, Jr., Ph.D., a state agency psychologist; Donald G. Heirs, Ph.D.; and Dr. William Humphries, M.D. Castle's attorney also submitted medical reports from Dr. Senter dated September 13, 2005, through September 12, 2007, to the Appeals Council.[10]

---

[9] Exhibit C17F refers to an updated narrative summary provided by B. Wayne Lanthorn, Ph.D. (R. at 772-73.)

[10] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether

10

On November 6, 2003, Castle presented to Dr. Nida at Community Physicians Services with complaints of increased knee pain. (R. at 616.) It was noted that Castle was a couple of years removed from a C-5 cervical fusion. (R. at 616.) Castle had no complaints of chest pain or shortness of breath. (R. at 616.) An examination revealed clear lungs bilaterally with no wheezes, rhonchi or rales. (R. at 616.) Castle was diagnosed with C-5 fusion, weight loss, degenerative disc disease, gout, allergies, gastroesophageal regflux disease, ("GERD"), hyperlipidemia, Sjogren's syndrome and carpal tunnel syndrome. (R. at 616.) Castle was placed on medications including Ultram, Prilosec, Wellburtin, Zanaflex, Paxil and ibuprofen. (R. at 616.)

Between October 3, 2003, and July 20, 2004, Castle presented to Dr. Senter eight times with primary complaints of chronic cervical neck pain, lumbar pain which radiated down his right leg, multiple joint pain, knee pain, anxiety and depression. (R. at 654-669.) At each of these visits, Dr. Senter noted upon examination that Castle was in no distress and that his affect was normal and appropriate. (R. at 654-669.) Dr. Senter noted tenderness over the left knee with no swelling or redness, and tenderness in the posterior cervical neck paraspinous muscles with pain on palpation and movement through the range of motion. (R. at 654-669.) Dr. Senter additionally noted tenderness in the lumbar paraspinous muscles with pain on palpation and flexion. (R. at 654-669.) Throughout these visits, Dr. Senter diagnosed Castle with degenerative disc disease of the cervical and lumbosacral spine, right lumbar radiculopathy, history of cervical fusion, status post left knee surgery, depressive

substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

neurosis and anxiety.  (R. at 654-669.)  Throughout this time, Castle was prescribed Percocet, OxyContin and Xanax.  (R. at 654-669.)

On January 26, 2004, Castle began treatment for depression with B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, after being referred by Dr. Senter. (R. at 710-12.)  On April 16, 2004, Lanthorn created a narrative summary for course treatment based on three visits by Castle from January 26, 2004, to April 9, 2004.  (R. at 702-09.)  Lanthorn noted that on each occasion, Castle was well oriented by person, place, time and circumstance.  (R. at 702.)  Additionally, Lanthorn noted that, during these visits, Castle did not manifest any signs of delusional thinking or was there any evidence of ongoing psychotic processes.  (R. at 702.)  Lanthorn reported that Castle's medical history included a ruptured disc in his neck in a job-related accident while operating a bulldozer, and that Castle was diagnosed with degenerative discs in his back and carpel tunnel syndrome.  (R. at 702-03.)  In addition, Castle reported having pain in his knees.  (R. at 703.)

Lanthorn opined that, at each visit, Castle always presented with an affect that was quite flat and blunted, and that his mood overall could readily be described as depressed.  (R. at 703.)  Lanthorn stated that Castle appeared irritable and easily aggravated, and he reported his sleep patterns as disrupted and his appetite as poor. (R. at 703.)  Lanthorn noted that Castle described himself as having no energy to do anything and that he found it difficult to initiate or complete tasks.  (R. at 703.)  Castle told Lanthorn that he preferred to be alone, even away from his family, and that often times he cried or felt like crying.  (R. at 703.)  Lanthorn noted that Castle denied any ongoing or active suicidal ideation, plans or intent.  (R. at 703.)  Castle stated to

12

Lanthorn that he worried daily and had a high degree of collateral anxiety and tension. (R. at 703.)

Lanthorn reported that Castle's typical day consisted of getting his son off to school, after which he tried to do "stuff around the house" that he was able to do. (R. at 704.) Castle admitted to Lanthorn that his activity level was very limited and that he was unable to lift, pull, carry or do almost any physical activity. (R. at 704.) Castle noted that he was no longer able to attend church and that he rarely went to the store. (R. at 704.) Castle reported to Lanthorn that his memory was poor, that he often drew blanks in conversations and that he had no difficulties with vision, speech or hearing. (R. at 704.)

Lanthorn administered to Castle a pain patient profile, which is a test designed for individuals who are experiencing and reporting an ongoing high degree of chronic pain, and is measured across three clinical scales. (R. at 705.) Lanthorn noted that Castle scored very high on all three scales indicating a marked degree of severity in each area measured. (R. at 705.) On the depression scale, Castle's results indicated that he was experiencing chronic fatigue, sadness, anhedonia, listlessness, as well as disruption in both sleep and appetite functions. (R. at 705.) On the anxiety scale, Castle's results indicated that he was experiencing significant agitation, generalized fear, apprehension and inner emotional turmoil. (R. at 705.) It also showed that Castle's impulse and temper control had been affected. (R. at 705.) On the somatization scale, Castle's results indicated that he was deeply troubled with physical problems, pain and health-related issues, all of which were having a negative impact on his life. (R. at 705.)

13

Lanthorn diagnosed Castle with major depressive disorder, single episode, severe, generalized anxiety disorder, pain disorder associated with both psychological factors and a general medical condition, chronic, occupational problems, economic problems and a Global Assessment of Functioning score, ("GAF"), of 45.[11]  (R. at 705.)

On February 11, 2004, Castle presented to Dr. Marco Berard, M.D., at Norton Community Hospital with complaints of knee pain.  (R. at 601.)  Dr. Berard noted that Castle had swelling of his left knee and pain with palpation of the joint line on the medial lateral side.  (R. at 601.)  An magnetic resonance imaging, ("MRI"), revealed a left knee meniscal tear, and as a result, Dr. Berard planned to perform a left knee scope to which Castle provided his informed consent.  (R. at 601.)

On March 22, 2004, Castle presented to Community Physicians Services with complaints of knee pain, although he noted that he underwent knee surgery three weeks prior to this visit, performed by Dr. Berard.  (R .at 615.)  Castle denied any fever, chills, shortness of breath, chest pain, nausea, vomiting, diarrhea, abdominal pain or changes in bowel or bladder function.  (R. at 615.)  It was noted that Castle's abdomen was soft and not tender with positive bowel sounds.  (R. at 615.)  It was also noted that Castle had no cyanosis, clubbing or edema in his extremities.  (R. at 615.)

---

[11] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 signals an individual has "serious symptoms or serious impairments in social, occupational or school functioning."  DSM-IV at 32.

It was further noted that Castle's strength was 5:5 in his upper and lower extremities bilaterally with a full range of motion. (R. at 615.) Castle was told to continue on the medications previously prescribed to him. (R. at 615.)

On April 26, 2004, Castle presented to Appalachian Orthopaedic Associates, P.C., with complaints of pain in both knees. (R. at 612.) Castle reported taking Bextra and having had Cortisone injections in the past, neither of which relieve the pain. (R. at 612.) Castle reported that the only noticeable relief came from Synvisc injections, which he stated he would like to resume. (R. at 612.) It was noted that Castle has genu varus tendency of both knees and no significant restrictions of motion. (R. at 612.) Between April 26, 2004, and May 13, 2004, Castle underwent three Synvisc injections, which he noted helped relieve the pain. (R. at 611.)

On May 25, 2004, Dr. Richard M. Surrusco, M.D., performed an RFC Assessment in which he found that Castle could occasionally lift and/or carry a maximum of 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and was limited in his ability to push and/or pull with his lower extremities. (R. at 713-20.) Dr. Surrusco opined that Castle could occasionally climb, balance, stoop, kneel, crouch and crawl, and imposed no manipulative, visual, communicative or environmental limitations. (R. at 716-18.) Dr. Surrusco noted that Castle goes for walks sometimes, drives, goes to doctor's appointments and helps out with inside work such as preparing simple meals. (R. at 719.) In addition, Dr. Surrusco noted that Castle could no longer walk, bend, pull or reach much because it

15

caused pain. (R. at 719.) Overall, Dr. Surrusco found Castle's subjective complaints to be partially credible. (R. at 719.)

On May 25, 2004, Eugene Hamilton, Ph.D., completed a Mental RFC assessment in which he found that Castle was not significantly limited in his ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (R. at 721-23.)

Hamilton found that Castle was moderately limited in his ability to understand remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the public. (R at 721-23.) Hamilton also found that there was no evidence of any limitation in Castle's ability to make simple

16

work-related decisions and to ask simple questions or request assistance. (R. at 721-23.)

Hamilton found that Castle exhibited anxiety and depression in the context of a physical injury and related pain experience. (R. at 723.) Hamilton noted that Castle's daily activities are impeded primarily by his physical condition, and from a mental standpoint, he was able to drive, attend appointments, take his own medications and prepare simple meals. (R. at 723.) Hamilton also noted that Castle did not allege disability due to a mental impairment. (R. at 723.)

On May, 25, 2004, R.J. Milan, Jr., Ph.D., completed a Psychiatric Review Technique form, ("PRTF"), in which he opined that an RFC assessment was necessary, based upon the categories of affective disorders, anxiety-related disorders and somatoform disorders. (R. at 724-39.) He also opined that Castle had medically determinable impairments of major depression, generalized anxiety disorder and pain disorder. (R. at 727-30.) With regard to Castle's functional limitations, Milan found that his restriction of activities of daily living had a mild degree of limitation, that his difficulties in maintaining social functioning, concentration, persistence and pace had a moderate degree of limitation and that his episodes of decompensation, each of extended duration had no degree of limitation. (R. at 734.)

From March 16, 2004, to September 12, 2007, Castle was treated by Dr. Senter many times for complaints chronic cervical neck pain, lumbar pain, knee pain, depression and anxiety. (R. at 740-60, 823-27, 837-85, 923-24.) At each appointment, Dr. Senter consistently noted that Castle was in no distress and that his

17

affect was normal and appropriate. (R. at 740-60, 823-27, 837-85, 923-24.) He consistently reported that Castle's heart was regular, his lungs were clear and that he was tender in the lumbar paraspinous muscles with pain on palpation and flexion, as well as tender in the posterior cervical neck parasponious muscles with pain on palpation and movement through the range of motion. (R. at 740-60, 823-27, 837-85, 923-24.) He additionally noted that Castle was tender over the joint lines of the left knee with pain on palpation and movement. (R. at 740-60, 823-27, 837-85, 923-24.) Throughout this period, Dr. Senter's diagnoses included degenerative disc disease of the cervical and lumbosacral spine, depressive neurosis, right lumbar radiculopathy, a history of cervical fusion, psoriasis, GERD, allergies, status post left knee surgery and anxiety. (R. at 740-60, 823-27, 837-85, 923-24.) Dr. Senter primarily prescribed Castle with OxyContin, Percocet, Protonix, Nexium, Allegra and Xanax. (R. at 740-60, 823-27, 837-85, 923-24.)

On September 14, 2004, Dr. Senter completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), in which he found that Castle could lift and/or carry 10 pounds occasionally and five pounds frequently, stand and walk for a total of three hours in an eight-hour workday, one-half hour of which without interruption, sit for four hours in an eight-hour workday, three-fourths of an hour without interruption. (R. at 767-69.) Dr. Senter additionally found that Castle could occasionally stoop, kneel, balance, crouch and crawl, but never climb, and that he was limited in his ability to handle, feel, push and pull, but not limited in his ability to reach, see, hear or speak. (R. at 768.) Additionally, Dr. Senter imposed environmental restrictions with regard to heights, moving machinery, temperature extremes and vibrations. (R. at 769.)

18

In a letter dated April 14, 2005, Lanthorn thanked Dr. Nida for referring Castle to him. (R. at 775.) In this letter, Lanthorn also opined that Castle was continuing to struggle with pain, as well depression and anxiety. (R. at 775.) Lanthorn opined that Castle was extremely depressed during that day's session and recommended increasing his Wellburtin dosage. (R. at 775.)

On April 15, 2005, Lanthorn created an updated narrative summary for course treatment based on seven visits by Castle from August 26, 2004, to April 14, 2005. (R. at 770-84.) Lanthorn stated that during the course of treatment, Castle had maintained steady psychotherapeutic contact and that Castle had approached therapy in a very straightforward and receptive fashion. (R. at 770.) In addition, Lanthorn noted that Castle experienced a variety of both physical and psychological difficulties over the course of time. (R. at 770.) Lanthorn stated that Castle had consistently complained that his bones and joints ached a great deal, in addition to reporting significant problems with short-term memory loss, poor concentration, a desire to be socially isolated, anhedonia, a loss of sexual drive and ever-increasing pain throughout his body. (R. at 771.) Castle reported to Lanthorn that the pain disrupted his sleep and that he felt substantial guilt over not being able to work. (R. at 771.)

Castle reported to Lanthorn that he had followed through on therapeutic suggestions by way of improving his memory, dealing with depression and irritability, but oftentimes relapsed due to the pain. (R. at 771.) Lanthorn noted that Castle reported nightmares and a variable appetite leading to weight loss. (R. at 771.) Lanthorn opined that Castle's appearance had progressively deteriorated. (R. at 771.)

19

Castle reported to Lanthorn that his brother was diagnosed with lupus in his blood, and he was worried that he had inherited this genetic disorder. (R. at 771.) At the time Lanthorn drafted the report, he noted that Castle was despondent, discouraged and depressed, with an affect that was flat and blunt, and he reported being easily aggravated. (R. at 772.) Castle reported to Lanthorn that he was the type of individual who had a high degree of anxiety which was often associated with his pain and limitations, as well as realistic worries such as money and other factors that were impacting his life. (R. at 772.)

Lanthorn diagnosed Castle with major depressive disorder, single episode, severe, pain disorder associated with both psychological factors and a general medical condition, chronic, generalized anxiety disorder, economic problems and occupation problems with a GAF of 40-45. (R. at 772-73.) Lanthorn additionally stated that Castle's condition was worsening and noted that it was advisable that he be seen at the University of Virginia to rule out the possibility that in addition to his work-related injury and subsequent chronic pain and limitations, he may have some other disease or disorder that was magnifying his difficulties. (R. at 773.) Lanthorn also stated that Castle was having significant problems with concentration, initiating and completing tasks, focusing his attention and socializing appropriately even with family members. (R. at 774.) Lanthorn concluded that Castle had made every effort to cope with his injury and subsequent difficulties, but he appeared to be finding it much more difficult to do over the three to five months preceding the visit. (R. at 774.)

On April 15, 2005, Lanthorn completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) in which he opined that Castle had poor/none

20

ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember and carry out complex job instructions, as well as detailed, but not complex, job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.  (R. at 785-87.)  Lanthorn also opined Castle had a fair ability to follow work rules, function independently, understand, remember and carry out simple job instructions and maintain personal appearance.  (R. at 786.)  Lanthorn based the assessment limitations on his previous diagnoses of major depressive disorder, single episode, severe, pain disorder associated with both psychological factors and a general medical condition, chronic, generalized anxiety disorder, economic problems and occupation problems with a GAF of 40-45.  (R. at 786.)

On April 20, 2005, Castle underwent a psychological evaluation by Donald G. Heirs, Ph.D., of the Virginia Department of Rehabilitative Services.  (R. at 788-96.)  Heirs noted that Castle was oriented and alert with a serious demeanor.  (R. at 790.)  He noted that Castle demonstrated normal motor reactions while standing up intermittently to relieve pain, and there were no signs of client distress.  (R. at 790.)  Heirs reported that Castle's mood was neutral, and he claimed to have a sleep disturbance and became irritable.  (R. at 790.)  Heirs opined that Castle's attention and concentration where within normal limits, and his short-term memory was worse than his long-term memory.  (R. at 790.)  Castle was able to name three large cities, recall the names of three presidents, interpret proverbs appropriately and recall three words immediately from a list of words, but could not remember any of them after five minutes.  (R. at 790.)

21

Castle explained his daily routine to Heirs as arising around 6:00 a.m. to send one son off to school and the other to work, after which he sat around or took a nap. (R. at 791.) Heirs reported that Castle would go outside in nice weather and that housework and other activities "make [him] hurt so the boys help out a lot and [his] wife cleans and cooks not very often." (R. at 791.) Castle reported being unable to do any outside work or perform the activities he used to perform such as hunting and fishing. (R. at 791.) Castle indicated that he did not visit anyone or have visitors. (R. at 791.)

Heirs reported that Castle had no difficulty relating to him for a period of four hours, and he was therefore likely to be able to relate to others without any difficulties. (R. at 791.) Even though his wife managed the funds, Heirs reported that Castle stated he would be able to manage them himself if she could not do it. (R. at 791.) Castle reported to Heirs that the pain was chronic in his neck, back, hands and joints, and that his knees sometimes locked up on him. (R. at 791.) In summarizing his report, Heirs stated that Castle grew up in poverty and was deprived of many things including running water. (R. at 792.) In addition, Heirs reported that Castle had difficulty learning in school, and his marriage and employment were good until his accident on the job, which caused him to become almost a different man, who was affected by severe, chronic physical pain. (R. at 792.) Heirs diagnosed Castle with pain disorder with both psychological factors and a general medical condition, chronic, depressive

disorders, possible learning disabilities and severe chronic pain and constricted functioning with a GAF of 55.[12]

On April 20, 2005, Heirs also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), in which he found that Castle had a good ability to follow work rules, interact with supervisors, function independently, understand, remember and carry out detailed, but not complex instructions and behave in an emotionally stable manner. (R. at 794-96.) Heirs found that Castle had a fair ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, maintain attention/concentration, understand, remember can carry out complex job instructions, relate predictably in social situations and demonstrate reliability. (R. at 794-96.) Heirs also found that Castle had an unlimited ability to understand, remember and carry out simple job instructions and maintain personal appearance. (R. at 794-96.) Heirs stated that his limitations were physical and non-psychological. (R. at 796.)

On April 29, 2005, and June 29, 2005, Castle returned to Dr. Nida with complaints of chronic neck pain after a recent C5 fusion with a bone graft to his neck. (R. at 833.) In addition, Castle cited chronic back pain, knee pain and muscle pain. (R. at 833.) Dr. Nida found Castle to be alert and oriented with normal heart, lungs, abdomen and extremities; however, Dr. Nida opined that Castle appeared to be depressed with a flat affect. (R. at 833.) At both visits, Castle was diagnosed with chronic pain syndrome with C5 fusion, degenerative joint disease, ("DJD"), gout, pain

---

[12] A GAF of 51-60 indicates that the individual has "moderate symptoms or moderate impairments in social, occupational or school functioning." DSM-IV at 32.

management by Dr. Senter, allergies, GERD, hyperlipidemia, Sjogren's syndrome, carpal tunnel syndrome, fibromyalgia and depression. (R. at 832.)

On May 5, 2005, Castle underwent an independent medical examination by Dr. William Humphries, M.D., of the Virginia Department of Rehabilitative Services. (R. at 797-804.) A review of systems showed that Castle had multiple joint pains in the rest of the joints of his body including the great toe, both elbows, both hips and both shoulders. (R. at 798.) A physical examination revealed that Castle was alert, pleasant and in no distress, and he answered questions appropriately and related well to the examiner. (R. at 799.) Dr. Humphries noted that Castle's neck range of motion was moderately reduced and there was moderate tenderness to palpation of the paraspinous muscles of the posterior cervical spine. (R. at 799.) Dr. Humphries found that Castle's back range of motion was mildly reduced and there was moderate tenderness to palpation of the paraspinous musculature between the scapulae and in the lower lumbar region. (R. at 799.)

Dr. Humphries reported that Castle's joint range of motion of the upper and lower extremities was full without tenderness, heat, swelling or deformity except slightly reduced motion of the wrist and some of the interphalangeal, ("IP"), IP joints of some of the fingers of each hand. (R. at 799.) He opined that lower extremity joint range of motion was within normal limits in both hips but extremes of motion elicited lumbar pain bilaterally. (R. at 799.) Dr. Humphries reported that knee and ankle range of motion were within normal limits with no gross abnormalities of the foot joints. (R. at 799.)

24

With regard to his coordination, Dr. Humphries noted that Castle could get on and off the table without difficulty, his grip, radial, median and ulnar never functions were intact bilaterally, his gait was mildly antalgic on the right side, however, he was able to heel and toe walk with assistance for balance from the examiner. (R. at 799.) Castle's deep tendon reflexes were absent in both biceps, 1+ and equal in both triceps and brachioradialis, ½ and equal in both knees and 1+ and equal in both ankles. (R. at 799.)

With regard to his mental status, Dr. Humphries noted that Castle was alert and oriented in all three spheres, his speech was intelligible and sustained, his behavior was appropriate, his thought and idea content were within normal limits, his memory was intact for recent and remote events and his intelligence was within normal range. (R. at 800.) Dr. Humphries diagnosed Castle with posttraumatic DJD or degenerative disc disease, ("DDD"), of the cervical spine, status post fusion, posttraumatic thoracic and lumbar strain, chronic, posttraumatic DJD of the left knee and possible early DJD of the right knee, carpal tunnel syndrome bilateral with bilateral carpal tunnel release with ongoing pain symptomatology, DJD in both hands and hypertension. (R. at 800.)

On May 3, 2005, Dr. Humphries also completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) in which he found that Castle could occasionally lift and/or carry a maximum of 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that he was limited in his ability to handle, reach, push and pull, but not limited in his ability to feel, see, hear or speak.

25

(R. at 803.)  Additionally, Dr. Humphries imposed environmental restrictions with regard to vibration only.  (R. at 804.)

On June 22, 2005, Dr. Senter completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), in which he found that Castle could lift and/or carry 10 pounds occasionally and five pounds frequently, stand and walk for a total of three hours in an eight-hour workday, and for one-half hour without interruption, sit for four hours in an eight-hour workday, and for three-fourths of an hour without interruption.  (R. at 805-07.)  Dr. Senter additionally found that Castle could occasionally stoop, kneel, balance, crouch and crawl, but never climb, and that he was limited in his ability to handle, feel, push and pull, but not limited in his ability to reach, see, hear or speak.  (R. at 805-07.)  Additionally, Dr. Senter imposed environmental restrictions with regard to heights, moving machinery, temperature extremes and vibrations.  (R. at 805-07.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2008).  If the Commissioner finds conclusively that a claimant is or is not disabled at any

26

point in the process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 13, 2005, the ALJ denied Castle's claims.  (R. at 23-33.)  The ALJ found that the doctrine of res judicata applied to the period on and prior to September 16, 2003.  (R. at 31.)  He found that no new and material evidence had been presented which would affect the finality of the prior decision of September 16, 2003, and there was no basis for reopening the prior decision.  (R. at 31.)  Castle met the insured status requirements of the Act for DIB purposes through September 30, 2004.  (R. at 32.)  The ALJ also found that Castle had not engaged in substantial gainful activity since September 30, 2004, the amended onset date.  (R. at 32.)  The ALJ found that Castle suffered from a severe impairment, namely degenerative disc disease of the cervical and lumbar spine.  (R. at 32.)  The ALJ found, however, that Castle did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404,

Case 2:08-cv-00018-GMW-PMS   Document 18   Filed 03/24/09   Page 27 of 41   Pageid#: 123

Subpart P, Appendix 1. (R. at 32.) The ALJ found that Castle retained the residual functional capacity, ("RFC"), to perform work which involves lifting and carrying 25 pounds occasionally and 10 pounds frequently. (R. at 32.) He also found that Castle could occasionally climb, stoop, kneel, crouch and crawl, but could not perform overhead reaching. (R. at 32.) Thus, the ALJ found that Castle could not perform his past relevant work as a bulldozer operator, framer hanger, garage door installer, service technician and timber cutter. (R. at 32.) The ALJ opined that Castle had the RFC to perform a significant range of light work. (R. at 32.) Based on Castle's age, education, work history, RFC and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Castle could perform, including those as a security guard, night watchman, assembler, inspector, machine tender, hand packer and waiter. (R. at 33.) Therefore, the ALJ concluded that Castle was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Castle argues that the ALJ erred by failing to find that Castle suffers from severe non-exertional impairments. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-14.) Specifically, Castle argues that substantial evidence does not support the findings by the ALJ regarding his mental impairments. (Plaintiff's Brief at 8-14.) Second, Castle argues that the ALJ erred by improperly determining Castle's RFC. (Plaintiff's Brief at 14-19.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the

28

Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Castle argues that the ALJ erred by failing to find that Castle suffers from severe non-exertional impairments. (Plaintiff's Brief at 8-14.) Castle notes that a finding that a claimant does not have a "severe" non-exertional impairment under the Act is only warranted if the claimant does not have an impairment or combination of impairments, which do not significantly limit his mental ability to do basic work activities. 20 C.F.R. § 404.1520(c) (West Group 2005), 20 C.F.R. § 404.1521(a)-(b)

29

(West Group 2005). Therefore, Castle limits his discussion of non-exertional impairments to include only mental limitations.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[13] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, although Castle does not make any argument beyond his assertion that he suffers from severe non-exertional impairments, the court will assume that he relies on Lanthorn's assessment that he had a GAF score of 45. (R. at 705, 772-73.) Such a score would indicate that Castle suffered from "severe symptoms," examples

---

[13] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

of which include suicidal ideation, severe obsessional rituals and frequent shoplifting. DSM-IV at 34. Among the other notes from Castle's visits with Lanthorn show that Castle presented many times to Lanthorn for treatment from January 26, 2004, to April 14, 2005. (R. at 702-12) Lanthorn noted that on each occasion, Castle was well oriented by person, place, time and circumstance. (R. at 702.) Additionally, Lanthorn noted that, during these visits Castle did not manifest any signs of delusional thinking or was there any evidence of ongoing psychotic processes. (R. at 702.) Lanthorn opined that, at each visit, Castle always presented with an affect that was quite flat and blunted, and that his mood overall could readily be described as depressed. (R. at 703.) Lanthorn stated that Castle appeared irritable and easily aggravated, and he reported his sleeping patterns as disrupted and his appetite as poor. (R. at 703.) Lanthorn noted that Castle described himself as having no energy to do anything and that he found it difficult to initiate or complete tasks. (R. at 703.) Castle told Lanthorn that he preferred to be alone, even away from his family, and that often times he cried or felt like crying. (R. at 703.) Lanthorn noted that Castle denied any ongoing or active suicidal ideation, plans or intent. (R. at 703.) Castle stated to Lanthorn that he worried daily and had a high degree of collateral anxiety and tension. (R. at 703.) Lanthorn diagnosed Castle with major depressive disorder, single episode, severe, generalized anxiety disorder, pain disorder associated with both psychological factors and a general medical condition, chronic, occupational problems, economic problems and a GAF of 45. (R. at 705.)

On April 15, 2005, Lanthorn created an updated narrative summary for course treatment based on seven visits by Castle from August 26, 2004, to April 14, 2005. (R. at 770-84.) Lanthorn stated that during the course of treatment, Castle had

maintained steady psychotherapeutic contact and that Castle had approached therapy in a very straightforward and receptive fashion.  (R. at 770.)  In addition, Lanthorn noted that Castle experienced a variety of both physical and psychological difficulties over the course of time.  (R. at 770.)

Castle reported to Lanthorn that he had followed through on therapeutic suggestions by way of improving his memory, dealing with depression and irritability, but oftentimes relapsed due to the pain.  (R. at 771.)  Lanthorn noted that Castle reported nightmares and a variable appetite leading to weight loss.  (R. at 771.)  Lanthorn opined that Castle's appearance had progressively deteriorated.  (R. at 771.)  At the time Lanthorn drafted the report, he noted that Castle was despondent, discouraged, depressed, his affect was flat and blunt and he reported being easily aggravated.  (R. at 772.)  Castle reported to Lanthorn that he was the type of individual who had a high degree of anxiety which was often associated with his pain and limitations, as well as realistic worries such as money and other factors that were impacting his life.  (R. at 772.)

Lanthorn diagnosed Castle with major depressive disorder, single episode, severe, pain disorder associated with both psychological factors and a general medical condition, chronic, generalized anxiety disorder, economic problems and occupation problems with a GAF of 40-45.  (R. at 772-73.)  Lanthorn also stated that Castle was having significant problems with concentration, initiating and completing tasks, focusing his attention and socializing appropriately even with family members.  (R. at 774.)  Lanthorn concluded that Castle has made every effort to cope with his injury

32

and subsequent difficulties, but he appeared to be finding it much more difficult to do over the three to five months preceding the visit. (R. at 774.)

The court finds such an assessment to be inconsistent with the other objective evidence of record, and thus it was proper for the ALJ to reject the opinion of Lanthorn. The other evidence of record includes notes from treating physicians Dr. Senter, as well as an independent psychological examinations by Hamilton, Heirs, Milan and Dr. Humphries.

Between October 3, 2003, and September 12, 2007, Castle presented to Dr. Senter many times with primary complaints of chronic cervical neck pain, lumbar pain which radiated down his right leg, multiple joint pain, knee pain, anxiety and depression. (R. at 654-69, 740-60, 823-27, 837-85, 923-24.) At each of these visits, Dr. Senter noted upon examination that Castle was in no distress and that his affect was normal and appropriate. (R. at 654-69, 740-60, 823-27, 837-85, 923-24.) Dr. Senter noted tenderness over the left knee with no swelling or redness, and tenderness in the posterior cervical neck paraspinous muscles with pain on palpation and movement through the range of motion. (R. at 654-69, 740-60, 823-27, 837-85, 923-24.) Dr. Senter additionally noted tenderness in the lumbar paraspinous muscles with pain on palpation and flexion. (R. at 654-69, 740-60, 823-27, 837-85, 923-24.) Throughout these visits, Dr. Senter diagnosed Castle with, among other physical ailments, depressive neurosis and anxiety. (R. at 654-69, 740-60, 823-85, 923-24.)

33

On May 25, 2004, Hamilton completed a Mental RFC assessment in which he found that Castle was not significantly limited in his ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (R. at 721-23.)

Hamilton found that Castle was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the public. (R at 721-23.) Hamilton also found that there was no evidence of any limitation in Castle's ability to make simple work-related decisions and to ask simple questions or request assistance. (R. at 721-23.)

Hamilton found that Castle exhibited anxiety and depression in the context of a physical injury and related pain experience.  (R. at 723.)  Hamilton noted that Castle's daily activities are impeded primarily by his physical condition, and from a mental standpoint, he was able to drive, attend appointments, take his own medications and prepare simple meals.  (R. at 723.)  Hamilton also noted that Castle did not allege disability due to a mental impairment.  (R. at 723.)

On May, 25, 2004, Milan completed a PRTF form in which he opined that an RFC assessment was necessary, based upon the categories of affective disorders, anxiety-related disorders and somatoform disorders.  (R. at 724-39.)  He also opined that Castle had medically determinable impairments that of major depression, generalized anxiety disorder and pain disorder.  (R. at 727-30.)  With regard to Castle's functional limitations, Milan found that his restriction of activities of daily living had a mild degree of limitation, that his difficulties in maintaining social functioning, concentration, persistence and pace had a moderate degree of limitation and that his episodes of decompensation, each of extended duration had no degree of limitation.  (R. at 734.)  Milan also noted that Lanthorn's assessed GAF and diagnoses were based on Castle's self-reports rather than his own assessment.  (R. at 739.)

On April 20, 2005, Castle underwent a psychological evaluation by Heirs.  (R. at 788-796.)  Heirs noted that Castle was oriented and alert with a serious demeanor.  (R. at 790.)  He noted that Castle demonstrated normal motor reactions while standing up intermittently to relieve pain, and there were no signs of client distress.  (R. at 790.)  Heirs reported that Castle's mood was neutral, and he claimed to have a sleep disturbance and became irritable.  (R. at 790.)  Heirs opined that Castle's attention and

35

concentration were within normal limits, and his short-term memory was worse than his long-term memory.  (R. at 790.)

Heirs reported that Castle had no difficulty relating to him for a period of four hours, and he was therefore likely to be able to relate to others without any difficulties. (R. at 791.)  Heirs diagnosed Castle with pain disorder with both psychological factors and a general medical condition, chronic, depressive disorders, possible learning disabilities and severe chronic pain and constricted functioning with a GAF of 55. (R. at 791.)

On April 20, 2005, Heirs also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), in which he found that Castle had a good ability to follow work rules, interact with supervisors, function independently, understand, remember and carry out detailed, but not complex instructions and behave in an emotionally stable manner.  (R. at 794-96.)  Heirs found that Castle had a fair ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, maintain attention/concentration, understand, remember and carry out complex job instructions, relate predictably in social situations and demonstrate reliability.  (R. at 794-96.)   Heirs also found that Castle had an unlimited ability to understand, remember and carry out simple job instructions and maintain personal appearance.  (R. at 794-96.)  Heirs stated that his limitations were physical and non-psychological.  (R. at 96.)

On May 5, 2005, Castle underwent an independent medical examination by Dr. William Humphries, M.D., of the Virginia Department of Rehabilitative Services.  (R.

at 797-804.)  With regard to his mental status, Dr. Humphries noted that Castle was alert and oriented in all three spheres, his speech was intelligible and sustained, his behavior was appropriate, his thought and idea content were within normal limits, his memory was intact for recent and remote events and his intelligence was within normal range.  (R. at 800.)  Dr. Humphries diagnosed Castle with only physical ailments rather than any mental impairments.  (R. at 800.)

The court finds the evidence set forth by treating physician Lanthorn is inconsistent with the other evidence of record from treating physician Dr. Senter, as well as independent psychological examinations by Hamilton, Heirs, Milan and Dr. Humphries. It would appear that at each examination, the examiner noted findings that supported the ALJ's failure to find any severe non-exertional impairments.  Hamilton made the notation that Castle did not allege disability due to a mental impairment.  (R. at 723.)  In addition, Milan noted that Lanthorn's assessed GAF and diagnoses were based on Castle's self-reports rather than his own assessment.  (R. at 739.)  With regard to Heirs, not only did he assess Castle's GAF to be significantly higher at 55, (R. at 791), but he additionally opined that Castle's limitations were physical and non-psychological.  (R. at 796.)  Lastly, Dr. Humphries diagnosed Castle with only physical ailments rather than any mental impairments.  (R. at 800.)  Thus, the overwhelming majority of the evidence shows support for the ALJ's finding that Castle did not suffer from a severe non-exertional impairment, but rather suffered from physical ailments.

Castle also argues that the ALJ erred by improperly determining Castle's RFC. (Plaintiff's Brief at 14-19.)  Much like his first argument, Castle does not make any

argument beyond his assertion that the ALJ's RFC determination is unsupported by substantial evidence of record. In fact, Castle simply restates the identical facts from his first argument to support his second argument.

The ALJ opined that Castle had the RFC to perform a significant range of light work, in which he found that Castle retained the RFC to perform work which involves lifting and carrying 25 pounds occasionally and 10 pounds frequently. (R. at 32.) He also found that Castle could occasionally climb, stoop, kneel, crouch and crawl, but could not perform overhead reaching. (R. at 32.) In making this determination, the ALJ relied primarily on the RFC finding of Dr. Senter, Dr. Surrusco and Dr. Humphries, as well as other objective evidence of record.

Castle most likely relies on Dr. Senter's RFC in which he found that Castle could lift and/or carry 10 pounds occasionally and five pounds frequently, stand and walk for a total of three hours in an eight-hour workday, and for one-half hour without interruption, sit for four hours in an eight-hour workday, and for three-fourths of an hour without interruption. (R. at 767-69.) Dr. Senter additionally found that Castle could occasionally stoop, kneel, balance, crouch and crawl, but never climb, and that he was limited in his ability to handle, feel, push and pull, but not limited in his ability to reach, see, hear or speak. (R. at 768.) Additionally, Dr. Senter imposed environmental restrictions with regard to heights, moving machinery, temperature extremes and vibrations. (R. at 769.) The ALJ rejected these findings which he stated as "being based solely on subjective findings as there are no demonstrated clinical signs or findings to substantiate this assessment." (R. at 29.) The ALJ cited evidence that Dr. Senter consistently stated that Castle was in no apparent distress and did not

38

report any side effects from his medications.  (R. at 29.)

The undersigned agrees with the ALJs rejection of Dr. Senter's medical assessment in making an RFC determination.  The evidence shows that at each appointment, Dr. Senter consistently noted that Castle was in no distress and that his affect was normal and appropriate.  (R. at 654-669, 740-60, 823-27, 837-85, 923-24.) He consistently reported that Castle's heart was regular, his lungs were clear, and that he was tender in the lumbar paraspinous muscles with pain on palpation and flexion, as well as tender in the posterior cervical neck parasponious muscles with pain on palpation and movement through the range of motion.  (R. at 740-60, 823-27, 837-85, 923-24.)  He additionally noted that Castle was tender over the joint lines of the left knee with pain on palpation and movement.  (R. at 740-60, 823-27, 837-85, 923-24.) Throughout this period, Dr. Senter's diagnoses included degenerative disc disease of the cervical and lumbosacral spine, depressive neurosis, right lumbar radiculopathy, a history of cervical fusion, psoriasis, GERD, allergies, status post left knee surgery and anxiety.  (R. at 740-60, 823-27, 837-85, 923-24.)

In making his RFC determination, the ALJ instead relied on the findings of Dr. Surrusco and Dr. Humphries to support a finding that Castle could perform light work. Dr. Surrusco found that Castle could lift and/or carry 10 pounds occasionally and five pounds frequently, stand and walk for a total of three hours in an eight-hour workday, and for one-half hour without interruption, sit for four hours in an eight-hour workday, and for three-fourths of an hour without interruption.  (R. at 767-69.)  Dr. Surrusco additionally found that Castle could occasionally stoop, kneel, balance, crouch and crawl, but never climb, and that he was limited in his ability to handle, feel, push and

39

pull, but not limited in his ability to reach, see, hear or speak. (R. at 768.) Additionally, Dr. Surrusco imposed environmental restrictions with regard to heights, moving machinery, temperature extremes and vibrations. (R. at 769.)

Dr. Humphries found that Castle could occasionally lift and/or carry a maximum of 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that he was limited in his ability to handle, reach, push and pull, but not limited in his ability to feel, see, hear or speak. (R. at 803.) Additionally, Dr. Humphries imposed environmental restrictions with regard to vibration only. (R. at 804.)

Dr. Humphries also reported that Castle's joint range of motion of the upper and lower extremities was full without tenderness, heat, swelling or deformity except slightly reduced motion of the wrist and some of the IP joints of some of the fingers of each hand. (R. at 799.) He opined that lower extremity joint range of motion was within normal limits in both hips but extremes of motion elicit lumbar pain bilaterally. (R. at 799.) Dr. Humphries reported that knee and ankle range of motion was within normal limits with no gross abnormalities of the foot joints. (R. at 799.)

The RFC findings of both Dr. Surrusco and Dr. Humphries are consistent in supporting the notion that Castle could perform light work. Therefore, the ALJ's RFC determination that Castle could perform light work is supported by substantial evidence.

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Castle's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This 24th day of March, 2008.

     **/s/ Glen M. Williams**     
     **THE HONORABLE GLEN M. WILLIAMS**
     **SENIOR UNITED STATES DISTRICT JUDGE**